IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JENNY CRAIG, individually and on behalf of all others
similarly situated,

                    Plaintiff,

                                                      Case No. 5:14-cv-05214-TLB

            v.

TWININGS NORTH AMERICA, INC.

                    Defendant.

## TWININGS' REPLY BRIEF

### Preliminary Statement

      Craig cannot save her case.  She claims to have been duped into purchasing Twinings' tea products labeled "Tea is a natural source of antioxidants," but not because tea is *not* a natural source of antioxidants, or because the antioxidants in Twinings' tea products are *not* natural.  That is not why she filed this lawsuit.  Her scarcely plausible theory of liability is, as Churchill once said of Russia, a "riddle wrapped in a mystery inside an enigma."  Craig asserts that the challenged label is unlawful and deceptive because it falsely led her to believe that the antioxidant nutrients in Twinings' tea "satisf[ied] minimum nutritional requirements" under federal regulations (Compl. ¶ 40).

      In opposing this motion, Craig abandons her "health claims" as a mistake (Opp. at 15, n.5), tempts the Court with a fundamentally flawed interpretation of the Arkansas Deceptive Trade Practices Act ("ADTPA") – upon which her entire case floats or sinks – and imbues the word "natural" with hypertechnical, idiosyncratic meaning.  None of it is enough to save this action from summary dismissal.

### Summary of Argument

      In 1990, almost twenty-five years ago, the Nutrition Labeling and Education Act ("NLEA") became law.  It amended the federal Food, Drug, and Cosmetic Act ("FDCA") by mandating the disclosure of certain nutrient information on food labels and setting standards for labeling claims that

characterize the level of specified nutrients in food. Food products labeled contrariwise are deemed "misbranded" by federal law.

The goal of the NLEA being "national uniform nutrition labeling," this law contains an express pre-emption provision that bars states from "directly or indirectly establish[ing] under any authority or continu[ing] in effect as to food in interstate commerce … any requirement for nutrition labeling of food that is not identical to the requirement of" federal law. 21 U.S.C. § 343-1(a). The question raised by this motion is whether Craig seeks to hold Twinings to state-law nutrition labeling requirements substantially "identical to" federal law. Because the answer is "no," all of Craig's claims are barred by pre-emption. To the extent her claims are not pre-empted, they fail as a matter of law for the reasons set out in Twinings' motion.

The pre-emption bar applies because the Arkansas Food, Drug, and Cosmetic Act ("Arkansas FDCA") does not include any nutrition-labeling requirements whatsoever – federal or state. The California FDCA, in contrast, expressly codifies federal FDCA nutrition-labeling standards, which distinguishes *Lanovaz* and other cases from that jurisdiction, which Craig begs the Court to follow.[1] Her reliance upon "standard of identity" labeling requirements for food under the Arkansas FDCA cannot save her claims from pre-emption because that provision of state law has nothing to do with nutrition labeling or nutrient-content claims.

---

[1] Craig further misleads the Court by saying that the *Lanovaz* "court has now certified the case to proceed as a class action" (Opp. at 2), which is a half-truth. The court in that case actually denied plaintiff's request for certification of a monetary damages class under Fed. Rule Civ. P. Rule 23(b)(3) for failure to satisfy *Comcast*, and certified only a Rule 23(b)(2) class for injunctive relief. See *Lanovaz v. Twinings N. Am., Inc.*, No. 12-cv-2646-RMW, 2014 WL 1652338 (N.D. Cal. Apr. 24, 2014) (order granting in part and denying in part class certification, etc.) (Dkt. No. 132), en banc *reh'g pet. denied*, No. 14-80070 (9th Cir. July 9, 2014) (Dkt. No. 140). With no interest in trying a Rule 23(b)(2) class action, Lanovaz recently moved the district court for reconsideration, where the matter is *sub judice* (*Id*., Dkt. Nos. 151, 155, 158, 160). Since then, another California federal district court has rejected the basis for Lanovaz's reconsideration papers. See *Brazil v. Dole Packaged Foods, LLC*, No. 12-cv-01831-LHK, 2014 WL 5794873, *13-14 (N.D. Cal. Nov. 6, 2014) (decertifying the Rule 23(b)(3) class based on the failure of plaintiff's proposed hedonic-regression theory of damages to satisfy *Comcast*).

In summary, Arkansas law is "not identical to" federal food-labeling requirements for purposes of avoiding pre-emption. Even if it were, though, tea is exempted from federal nutrition-labeling requirements, and the challenged statement is not a nutrient-content claim that would subject Twinings to those standards, because it characterizes the *source* of antioxidants in Twinings' tea as being derived from nature as opposed to chemical synthesis, not the *level* of antioxidants in those teas.

### Argument

#### A.   All Claims Are Expressly Pre-empted

Craig seeks to rewrite federal nutrition-labeling law by distorting the language of the NLEA, and the FDA regulations it enabled, beyond their plain meaning. The NLEA mandates the disclosure of information about certain "nutrients" in food labeling, and sets conditions for making a "nutrient content claim" on food labels, which the FDA defines as a statement "that expressly or implicitly *characterizes the level of a nutrient* of the type required to be in nutrition labeling." NLEA, Pub. L. 101-535, 104 Stat. 2353 (1990); 21 C.F.R. § 101.13(b) (emphasis added). Failure to comply with this law renders a product "misbranded."

Craig thus seeks private enforcement of the FDCA, which she is allowed to do under state law, provided it is substantively "identical to" federal law. Because the Arkansas FDCA does not expressly or implicitly adopt FDCA nutrition labeling requirements, however, its law is "not identical to" federal law and her claims are barred.

#### 1.   Arkansas Has Not Adopted Federal or State Nutrition-Labeling Requirements

Craig asserts that her suit is based on Arkansas law (Opp. at 11). But she grounds her misbranding theory of liability on federal requirements applicable to "'good source' claims" (*id*. §101.54(c)), and "nutrient content claims using the term 'antioxidant'" (*id*. §101.54(g)) (Opp. at 3-4, 14, and 22). She claims that Twinings has made unlawful nutrient-content claims simply by using the words "source" and "antioxidants" on its packaging. *Id*. at 22. Craig insists her claims are not pre-empted

because she "only seeks to enforce Arkansas laws that impose a standard of conduct that is identical to that imposed by the FDCA" (Opp. at 11).

Saying so over and over again (*id.* at 12, 14), however, does not make it so, and Craig does not point to any provision of Arkansas law that imposes nutrition-labeling requirements. She refers only to Ark. Code Ann. § 20-56-209(7), which she tells the Court "declar[es] food to be 'misbranded' if it falls short of standards prescribed by the 'federal Food, Drug, and Cosmetic Act'" (Opp. at 11). This is true, but wholly beside the point because that section of the Arkansas FDCA pertains only to "standard of identity" regulations prescribed by either the State Board of Health (under Ark. Code Ann. § 20-56-219) or the FDA (see 21 C.F.R. § 101.3), neither of which is at issue here. Craig cites no provision of the Arkansas FDCA that adopts or mirrors, as a matter of state law, any of the federal regulations having to do with "nutrition labeling of food" (21 C.F.R. § 101.9), "nutrient content claims" (21 C.F.R. § 101.13), "'good Source' claims" (21 C.F.R. § 101.54(c)), or "nutrient content claims using the term 'antioxidants'" (21 C.F.R. § 101.54(g)).

This is fatal to her claims. Section 343-1(a) of the FDCA expressly forecloses any "State requirement [that] directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food" that are "not imposed by or contained in the applicable provision" or "[d]iffer from those specifically imposed by or contained in the applicable provision of" of federal law. 21 C.F.R. § 100.1(c)(4); see also Mot. at 16, n.5 (citing cases).

Because the Arkansas FDCA does not expressly or implicitly incorporate any reference to federal nutrition-labeling requirements, Craig's claims are "not identical to" federal law and thus pre-empted. See 21 U.S.C. § 343-1(a).

### 2. Tea Products Are Exempt From Federal Nutrition-Labeling Requirements and the Challenged Statement Is Not A Nutrient-Content Claim

Critically, the FDA exempts various foods from its "nutrient content claim" regulations, including tea and coffee. Foods, such as "tea leaves" are exempt from federally mandated nutrient

4

disclosure requirements, as they "contain insignificant amounts of all of the nutrients and food components required to be included in the declaration of nutrition information under [§ 101.9(c)]." 21 C.F.R. § 101.9(j)(4). For these products, only voluntary disclosures of "nutrition information" and "nutrient [content] claims" within the meaning of 21 C.F.R. § 101 *et seq.* bring labeling statements within the reach of federal law. Craig does not and cannot allege any such facts here, because the challenged statements do not "characterize the level" of any antioxidant nutrient.

Ignoring this provision, Craig seeks to hold Twinings to federal labeling requirements from which it is exempt. The challenged statement does not subject Twinings to federal nutrient-content regulations because it characterizes the *source* of antioxidants in its teas (i.e. derived from nature as opposed to chemical synthesis), not the *level* of those antioxidants. In reply, Craig plays with semantics, contending that the FDA "clearly condemns" use of terms like "source" and "antioxidant on a product label except in certain circumstances" (Opp. at 14). Such nonsense recalls Lewis Carroll's classic advice on the construction of language: "'When *I* use a word,' Humpty Dumpty said in a scornful tone, 'it means what I choose it to mean – neither more nor less.'" *Through the Looking-Glass*, *in* THE COMPLETE WORKS OF LEWIS CARROLL 196 (1939). The federal FDCA defines and limits not just any mention of the terms "source" and "antioxidants" on food labels, but only when those words are used to make "[a] claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling" under 21 C.F.R. § 101.9, which is not so here. See 21 C.F.R. § 101.54(c) & (g). Since the words "Tea is a natural source of antioxidants" do not "characterize the level of a nutrient of the type required to be in nutrition labeling," the challenged statement does not constitute a nutrient-content claim under the federal FDCA. See 21 C.F.R. § 101.13(b); 21 U.S.C. § 343(r).[2] In brief,

---

[2] A few points to close this door. *First*, the term "good source" does not appear on any of the product labels at issue in this case (Compl. ¶ 3, Exhibits 1&2), and the FDA has defined "natural" only in a non-binding regulatory guidance note. Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms, 56 Fed. Reg. 60421, 60466 (Nov. 27, 1991) (pursuant to its "informal policy" the FDA "has considered 'natural' to mean that nothing artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally be expected to be there"); Food Labeling: Nutrient Content

because plaintiff's claims are different from and in addition to federal law (i.e. not identical), they are beyond the bounds of state law to enforce and, as such, pre-empted.

### B. The ADTPA's Causal Language Requires Reliance

Hoping to facilitate class certification down the line, Craig labors to advocate elimination of the traditional common law requirement of reliance applicable to misrepresentation cases. Unable to deny that "a host of individual factors could have influenced a class member's decision to purchase the product," *Hazelhurst v. Brita Products*, 744 N.Y.S.2d 31, 33 (N.Y. App. Div. 2002), Craig insists that "the ADTPA requires *causation*, not reliance," and "makes no mention of 'reliance'" whatsoever (Opp. at 19; emphasis in original). She then counts the noses of courts hither and yon said to share her view, and invites this one to join "the mainstream of American law by declining to write a reliance requirement into the ADTPA" (Opp. at 19, 21).

Accepting plaintiff's invitation, however, would require the Court to rewrite § 4-88-113(f) of the ADTPA, which authorizes a private cause of action for persons who suffer actual damage "*as a result of*" a violation of the Act. Plaintiff construes this causation requirement to mean only that plaintiff's loss must be linked in some undefined way to a defendant's conduct, arguing unconvincingly that "causation" and "reliance" are different concepts in the context of misrepresentation cases. The

---

Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2302, 2407 (Jan. 26, 1993) ("The agency will maintain its current policy (as discussed in the general principles proposal (56 FR 60421 at 60466)) not to restrict the use of the term 'natural' except for added color, synthetic substances, and flavors as provided in § 101.22. Additionally, the agency will maintain its policy (Ref. 32) regarding the use of 'natural,' as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food. Further, at this time the agency will continue to distinguish between natural and artificial flavors as outlined in § 101.22."). *Second*, "good source" and "natural" are not synonyms. In reference to things, "good" suggests *quantity*, as in "[h]aving in adequate degree those properties which a thing of the kind ought to have." OXFORD ENGLISH DICTIONARY 668 (Clarendon Press 2d ed. 2001). "Natural," by contrast, is defined in terms of *quality*, as in "matters having their basis in the natural world or the usual course of things or things "constituted by nature." *Id*. at 240-41. *Finally*, the FDA warning letter Craig cites in support of her position (Opp. at 13), is (1) non-binding, "informal and advisory" (see FDA, *Regulatory Procedures Manual*, ch. 4 – Advisory Actions, at 4-1 (2011)), and (2) does not address Twinings' argument. See, e.g., *Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc*., 586 F.3d 500, 508 (7th Cir. 2009) (FDA warning letters not final agency action binding on district court).

ADTPA's causal language logically embraces a reliance requirement, however.  As Professor Prosser explained:

> <u>The causal connection between the wrongful conduct and the resulting damage, essential throughout the law of torts, takes in cases of misrepresentation the form of inducement of the plaintiff to act, or to refrain from acting, to his detriment … In order to be influenced by the representation, the plaintiff must of course have relied upon it, and believed it to be true.</u>  If it appears that he knew the facts, or believed the statement to be false, or that he was in fact so skeptical as to its truth that he reposed no confidence in it, it cannot be regarded as a substantial cause of his conduct.

See Sheila B. Scheuerman, *The Consumer Fraud Class Action:  Reining in Abuse by Requiring Plaintiff to Allege Reliance as an Essential Element*, 43 HARV. J. ON LEGIS., 44-5 (2006) (quoting WILLIAM L. PROSSER, LAW OF TORTs § 108, at 714 (4th ed. 1971) (emphasis added).  Put differently, "damages cannot be 'caused' by a defendant's misrepresentation without reliance on the statement."  *Id*. at 45.  Craig cites no Arkansas authority to the contrary.

Courts rejecting this principle, like those plaintiff bundles in a string citation almost three pages long (see Opp. at 19-21), "have misunderstood the relationship between reliance and causation in a misrepresentation case."  *Id*.  The decade old case that plaintiff cites as evidence of a "national trend to interpret consumer protection statutes … such that plaintiffs need not prove reliance," *Smoot v. Physician's Life Insurance Co*., illustrates the point.  In that case, the New Mexico Court of Appeals argued that "causation and reliance are distinct concepts," noting that "causation requires a nexus between a defendant's conduct and a plaintiff's *loss*; reliance concerns the nexus between a defendant's conduct and a plaintiff's *purchase or sale*."  87 P.3d 545, 550 (N.M. Ct. App. 2003) (emphasis added).  Good as far as it goes, this argument "ignores the fact that in a misrepresentation case, the plaintiff's 'loss' is the 'purchase or sale,'" since consumers "seek to recover the money spent on the product."  *The Consumer Fraud Class Action*, supra, at 45.  Numerous courts have made the same observation, holding that the words "as a result of" in statutes just like the ADTPA incorporate a reliance element.

In *Oliveira v. Amoco Oil Co*., 776 N.E.2d 151, 157 (Ill. 2002), for instance, the Illinois Supreme Court explained how it looked to federal cases interpreting the causation requirement under

Rule 10(b)(5) of the anti-fraud provisions of securities law to determine the type of causal connection a plaintiff must prove to recover damages under that state's Consumer Fraud and Deceptive Business Practices Act. Influenced by federal decisions requiring plaintiffs to prove both transaction causation (i.e. reliance) and loss causation in such cases, the court adopted a similar analysis for Illinois consumer law, which also includes the words "as a result of." See also *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926-27, 928 (Ill. 2007) ("The 'as a result of' language … imposes an obligation upon a private individual seeking actual damages under the Act to 'demonstrate that the fraud complained of proximately caused' those damages in order to recover for his injury.… Under *Oliveira* and its progeny, plaintiffs must prove that each and every consumer who seeks redress actually saw and was deceived by the statements in question."); *Campbell v. Beak*, 568 S.2d 801, 805 06 (Ga. 2002) ("[W]e construe [the 'as a result of' language of the statute] as incorporating the 'reliance' element of the common law of tort of misrepresentation into the causation element of an individual claim under the [statute].").

        Other courts have reached the same result by drawing a distinction between the different purposes served by public enforcement actions and private damages actions, and eliminate the reliance element only in public actions where the focus is on deterring trade practices with a "capacity" or "tendency to deceive" on behalf of the public generally. In private actions seeking compensation, by contrast, they treat "fraud like fraud" and require reliance-causation. See *The Consumer Fraud Class Action*, supra, at 4.

        The Washington Court of Appeals explained this crucial distinction in *Nuttal v. Dowell*, 639 P.2d 832 (Wash. Ct. App. 1982), observing:

> [C]onsumer reliance need not be shown to establish that a misrepresentation is unfair or deceptive so long as it has a capacity or tendency to deceive. This principle would and should apply to any action which seeks to enjoin or otherwise deter … misconduct, e.g., where the Attorney General sues to enforce [the Consumer Protection Act] on behalf of the public generally.
>
> But [in a private action] in which [a] plaintiff seeks recovery of damages … he must establish some causal link between defendant's unfair act and his injury.

8

> \* \* \*
>
> *We hold that a party has not established a causal relationship with a misrepresentation of fact where he does not convince the trier of fact that he relied upon it.*

*Id*. at 840 (citations omitted; emphasis added).  See also *Weinberg v. Sun. Co., Inc*., 777 A.2d 442, 446 (Pa. 2001) (explaining that while abandonment of the reliance requirement might be "appropriate for a high public official responsible for protecting the public interests" as a remedial matter, it should not be used to strengthen the hand of private litigants seeking compensation under statutory law).

In short, the court should resist Craig's urging to rewrite Arkansas law by reading the words "as a result of" out of the ADTPA.  It is a causation requirement, and she draws "the wrong causal connection."  *The Consumer Fraud Class Action*, supra, at 29, n.11.  A misrepresentation cannot cause harm unless it influences a plaintiff's purchasing decision:  "That inducement to purchase provides the causal connection between the manufacturer's false statement and the consumer's resulting harm."  *Id*. (citing WILLIAM L. PROSSER, LAW OF TORTS § 108, at 714 (4th ed. 1971)).  The traditional reliance-causation requirement should not be loosened in private claims for damages like this one.  *Id*. at 20.

    **C.**    **Plaintiff Does Not State Claims Under Arkansas Law**

        **1.**    <u>**The ADTPA Forecloses Actions for Diminished Value**</u>

Craig attempts to distinguish her cause of action from the line of Arkansas cases foreclosing ADTPA actions to recover a mere "diminution in value," claiming that the tea products delivered to her were "not in fact what was promised" (Opp. at 23).  But Craig purchased and obtained tea products; indeed, tea products with naturally occurring antioxidants.  Litigating a "trifle" (Opp. at 5, n.1), her claims fall squarely within the type of hypothetical injury that the Arkansas Supreme Court rejected in *Wallis* v. *Ford Motor Co*., 208 S.W.3d 153 (Ark. 2005).  Unlike Craig, the plaintiff in *M.S. Wholesale Plumbing, Inc. v. Univ. Sports Publ. Co*., 2008 WL 09922 (E.D. Ark. Jan. 7, 2008), was "not alleging that it purchased a product with less economic value than represented by the seller." *Id*. at \*4.  This is

the essence of Craig's claim.  See Compl. ¶ 15 ("Misbranded food has no economic value and is legally worthless.  Purchasers of misbranded food are entitled to a refund of their purchase price.").

### 2. Labeling Violations Alone Do Not Give Rise to Implied Warranty Liability

Unable to allege that Twinings' tea products are contaminated or otherwise not fit for ordinary use, Craig rewrites § 20-56-215(1) of the Arkansas FDCA – which prohibits the "manufacture or sale, delivery, holding, or offering for sale" of misbranded products – in an effort to salvage her warranty claims (Opp. at 25).  More specifically, she turns this provision on its head, using it to argue that the "ordinary purpose" of any product includes "the ability to possess or transfer the item" legally (Opp. at 5, n.1).  Relying on *Meyers v. Malone & Hyde, Inc.*, 173 F.2d 291 (8th Cir. 1949), she then argues that this statute somehow gives a consumer in *possession* of allegedly misbranded food an actionable claim for breach of implied warranty (Opp. at 25-26).  It is more weight than the old case – or the Arkansas FDCA – can bear.

First, the statute prohibits only sellers and others in the distribution chain from "holding" misbranded products "for sale."  A.C.A. § 20-56-215(1); see also A.C.A. § 20-56-215(4) (prohibiting "[t]he sale, delivery for sale, holding for sale, or offering for sale" of food contaminated by microorganisms).  Ignoring the wording of the statute, and without any supporting case law, Craig reads the word "holding" without regard to its qualification "for sale" in order to contend that it prohibits a consumer's mere possession of a misbranded product under Arkansas law, even if the consumer is unaware of the misbranding.  Her reading of the statute also conflicts with its other provisions, which protect unknowing consumers from its sweep.  See A.C.A. § 20-56-215(3) (prohibiting the "receipt in commerce of any food … *knowing it to be … misbranded* … and the delivery or proffered delivery thereof for pay or otherwise") (emphasis added); see also Compl. ¶ 14 (denying knowledge that "Twinings Products [sic] were misbranded under Arkansas law and that the products bore misleading food labeling claims").

Second, *Myers* has not been cited as authoritative by any Arkansas court since it was decided 65 years ago. This is hardly surprising since it involved the Arkansas Sales Act, which was replaced by the state's Uniform Commercial Code in 1961. See A.C.A. § 4-2-314. In any event, *Myers* rests on cases involving food items that were contaminated and "unfit for human food," which is not what this case is about. See *Myers*, 173 F.2d at 295 (citing *Smith v. Great Atlantic & Pacific Tea Co.*, 170 F.2d 474 (8th Cir. 1948). More recently (and significantly), a California federal district court in a food misbranding case rejected a similar reading of *Myers*, dismissing implied warranty claims under California law on the ground that "a labeling violation alone" does not "give[] rise to an implied warranty of merchantability claim, where the product does not otherwise lack a basic degree of fitness for ordinary use." *Swearingen v. Amazon Preservation Partners, Inc.*, No. 13-cv-04402, 2014 WL 3934000, *1 (N.D. Cal. Aug. 11, 2014). The same result should apply here.

Craig's implied warranty theory is without statutory support or precedent, and should be dismissed.

### 3. An Express Warranty Claim Cannot Be Run on the Basis of an Omission

Craig's express warranty claim rests oddly on an alleged omission, namely Twinings' failure to inform her that its teas did not contain the "minimum levels of antioxidants" mandated by federal law for nutrient content claims (Opp. at 26). An omission, however, cannot give rise to an express warranty claim, and the words "minimum" and "levels" appear nowhere on the tea products she purchased. Her claim is more accurately described as nondisclosure of a claimed misbranding, which does not fit within any recognized express-warranty theory. See, e.g., *Sidco Prods. Mktg., Inc. v. Gulf Oil Corp.*, 858 F.2d 1095, 1098-99 (5th Cir. 1988) (omissions "are not affirmative representations of any sort and thus cannot support a warranty claim, because express warranties must be explicit"). The only possible express "affirmation of fact" or "promise" made to Craig was that "Tea is a natural source of antioxidants" – a fact she does not dispute. Because Craig nowhere alleges that the products failed to conform to this

statement, she does not plausibly plead a breach. The express warranty claim fails of its essential elements, therefore, and should be dismissed.

### 4. If Craig Unjustly Enriched Anyone, It Was Retailers, Not Twinings

Craig's claim for unjust enrichment fails for the reasons outlined in Twinings' motion (Mot. at 24-25). She alleges no benefit received by Twinings, or facts showing that Twinings was enriched by her retail purchases. See *White v. Volkswagen Grp. of N. Am.*, No. 2:11-CV-02243, 2013 WL 685298, at *8 (W.D. Ark. Feb. 25, 2013). Unable to bridge this gap (Opp. at 24-25), her unjust enrichment claim fails as a matter of law.

### 5. Craig's Negligence Claim Has No Legs

Craig's abandonment of her negligence per se claim (Opp. at 26-27) does not save her negligence claim – to the effect that Twinings was negligent in selling her a misbranded product "which is unlawful to possess" (Opp. at 26). This is the same misreading of the Arkansas statute that Craig asserts elsewhere in her brief, and is unavailing for reasons already stated. Her cause of action for negligence should be dismissed.

### D. Alternatively, the Class Allegations Should Be Stricken

The Court should strike the class allegations for lack of ascertainability and because individual issues of reliance-causation will unavoidably predominate.

**Ascertainability.** Without a method for ascertaining class membership, Craig proposes two stop-gap measures: class member affidavits, or proceedings before a special master (Opp. at 28). Neither measures up.

In *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013), the Third Circuit found the putative class (purchasers of defendant's diet supplement) was not ascertainable because of insufficient evidence that retailer records could be used to identify class members. *Id*. at 308-9. The Third Circuit rejected plaintiff's proposed use of class-member affidavits because they would deprive the defendant of an opportunity to challenge class membership. *Id*. at 309. It further held that "there is a significant

12

likelihood their recovery will be diluted by fraudulent or inaccurate claims," and that absent class members could then argue that they are not bound by a judgment because the named plaintiff did not adequately represent them. *Id*. at 310. All that Craig can muster in reply is the bald assertion that *Carrera* is wrong.

Unlike plaintiffs in *Lilly v. Jamba Juice Co*., No. 13-cv-2998-JST, 2014 WL 4652283, at *5 (N.D. Cal. Sept. 18, 2014), though, Craig does not offer "a detailed plan for notice" or any other mechanism for determining class membership with objective criteria. It therefore remains "unclear how Plaintiff intends to determine who purchased [the product] during the proposed class period," how much "each of these putative class members purchased," and "how Plaintiff intends to weed out inaccurate or fraudulent claims." *Sethavanish v. ZonePerfect Nutrition Co*., No. 12-2907-SC, 2014 WL 580696, at *5 (N.D. Cal. Feb. 13, 2014). Without more, her proposed class is not ascertainable. *Langendorf v. SkinnyGirl Cocktails, LLC*, No. 11-cv-7060, 2014 WL 5487670, at *2 (N.D. Ill. Oct. 30, 2014) ("[F]or a class to be ascertainable, there must be a showing by plaintiff that some method exists to identify the members."); *Stewart v. Beam Global Spirits & Wine, Inc*., Civ. No. 11-5149, 2014 WL 2920806, at *12 (D.N.J. June 27, 2014) ("[R]elying on affidavits of putative class members … is generally insufficient to meet the requirements of Rule 23 … [and] practically ignores the need for a class definition based on objective criteria."); *In re POM Wonderful LLC*, No. ML 10-02199, 2014 WL 1225184, *6 (C.D. Cal. Mar. 25, 2014) ("[W]here purported class members purchase an inexpensive product for a variety of reasons, and are unlikely to retain receipts or other transaction records, class actions may present such daunting administrative challenges that class treatment is not feasible."); *Red v. Kraft Foods, Inc*., No. CV 10-1028-GW, 2012 WL 8019257 at *5 (C.D. Cal. Apr. 12, 2012) ("Cases where self-identification alone has been deemed sufficient to render a class ascertainable generally involve situations where consumers are likely to have retained receipts, where the relevant purchase was a memorable big ticket item, or where the defendant would have access to a master list of either consumers or retailers who dealt with the items at issue.") (citations omitted).

Craig's alternative – special-master proceedings – fares no better. She suggests that a special master should resolve "distribution issues" after "common liability" and "class-wide damages" have been determined (Opp. at 28). But "distribution" is not the issue. To be eligible for certification, "the class must be clearly defined and must be ascertainable without a prolonged and individualized analytical struggle." *Gibbs Properties Corp. v. Cigna Corp.*, 196 F.R.D. 430, 439 (M.D. Fla. 2000); *Walls v. Sagamore Ins. Co.*, 274 F.R.D. 243, 258 (W.D. Ark. 2011). Craig's approach runs directly counter to the very purpose behind an objectively identifiable, manageable, and ascertainable class, which is knowing who will be bound by the court's ruling for *res judicata* purposes. *Carrera*, 727 F.3d at 307 ("*[A]t the commencement of a class action*, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class" and "ensures that a defendant's rights are protected by the class action mechanism") (emphasis added).

Craig's position finds no support either in *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001), which involved "class members who can be identified by defendants' own records." *Id.* at 142. There, the Second Circuit suggested a special master as one of several management tools a court might use to address "individualized damages issues" that might arise in a class action. *Id.* at 141. The initial issue here (i.e. who the class members are) was not a concern, and the court did not authorize a special master to determine class membership, which is what Craig seems to suggest.

Tying up loose ends, the only reason to await discovery in this case would be to provide Craig with a means for ascertaining membership of her putative class, but she never suggests as much. Neither of the mechanisms she proposes to satisfy the ascertainability requirement – consumer affidavits or special master proceedings – requires discovery.

**Predominance.** Finally, Craig's class allegations should be stricken because their resolution unavoidably implicates individual issues of reliance-causation (supra, pp. 6-9). This is an insurmountable hurdle to class certification under Rule 23(b)(3). See *Weiner v. Snapple Bev. Corp.*, No.

07-cv-8742, 2010 WL 3119452, at *6 (S.D.N.Y. 2010) (denying class certification in "All Natural" deceptive trade practice action because "individualized inquiries as to causation, injury, and damages" predominate); *In re ConAgra Foods, Inc.*, No. CV-11-05379, 2014 WL 4104405, *30 (C.D. Cal. Aug. 1, 2014) (citing the predominance of individual reliance and causation issues).

The Court should accordingly grant Twinings' motion to strike Craig's class allegations.

**Conclusion**

For all these reasons, and those found in its opening brief, Twinings respectfully requests dismissal of the amended complaint with prejudice or, in the alternative, that the class allegations be stricken.

Dated:   November 17, 2014                    Respectfully submitted,

           Kevin A. Crass (84029)
           R. Christopher Lawson (93083)
           FRIDAY, ELDREDGE & CLARK, LLP
           400 West Capitol Avenue, Suite 2000
           Little Rock, Arkansas  72201-3522
           Phone: (501) 376-2011
           Fax: (501) 376-2147
           crass@fridayfirm.com
           lawson@fridayfirm.com

           /s/  David L. Wallace
           David L. Wallace, *pro hac vice*
           Michael R. Kelly, *pro hac vice*
           HERBERT SMITH FREEHILLS NY LLP
           450 Lexington Avenue, 14th Floor
           New York, New York  10017
           Phone: (917) 542-7600
           Fax: (917) 542-7601
           david.wallace@hsf.com
           michael.kelly@hsf.com

           *Attorneys for Defendant*
           TWININGS NORTH AMERICA, INC.